IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2006

# DEMOND GARDNER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 01-00788      W. Mark Ward, Judge**

---

**No. W2006-00170-CCA-R3-PC  - Filed February 26, 2007**

---

The Petitioner, Demond Gardner, filed a pro se petition for post-conviction relief claiming that he received the ineffective assistance of counsel.  After appointing the Petitioner counsel and holding a hearing, the post-conviction court denied relief.  The Petitioner filed this appeal, contending that he received the ineffective assistance of counsel.  Finding no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Gregory Carman, Memphis, Tennessee, for the Appellant, Demond Gardner.

Robert E. Cooper, Jr., Acting Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William L. Gibbons, District Attorney General; Chris Scruggs, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I.  Facts**
**A. Factual Background**

A Shelby County jury convicted the Petitioner of first degree murder, and he was sentenced to life in prison without the possibility of parole.  This Court affirmed the Petitioner's conviction and sentence on direct appeal, and the Tennessee Supreme Court denied permission to appeal.  Subsequently, the Petitioner filed a petition for post-conviction relief, alleging that he received the ineffective assistance of counsel at trial.  The post-conviction court appointed counsel, conducted a hearing, and denied relief.  The Petitioner now appeals the post-conviction court's decision and contends that he received ineffective assistance of counsel.  Specifically, the Petitioner contends that his trial counsel failed to have mental health experts ascertain the viability of a diminished capacity

argument.[1]

The facts underlying the Petitioner's conviction were summarized on direct appeal as follows:

> Zain Holst testified that he and the victim were friends and had both graduated from South Side High School in 2000. On the morning of his death, the victim attended a Homecoming pep rally, then met Mr. Holst outside South Side High School. After the pep rally, a fight broke out. Mr. Holst and the victim were not involved in the fight but stood on the opposite corner down the street from where the fight occurred. After the fight was over, they walked toward the scene of the fight to see a damaged car, then walked down Lucille Avenue in the direction of Longview Middle School. As they walked on the sidewalk with the victim walking closer to the street, they approached a friend's car in order to get a ride. Mr. Holst said a white car approached them from the opposite direction, pulled over to the wrong side of the road, and stopped a couple of feet from them. He said no other car was in front of the white car. He said the defendant popped up from the backseat and pointed a long gun at them through the window. They did not exchange words or gestures with the defendant. Mr. Holst and the victim ducked and began to run toward their friend's car, and the defendant fired a shot. Mr. Holst turned around before reaching the car because he realized the victim had been shot in the face. The white car then drove off. Mr. Holst also said that neither he nor the victim were members of a gang.
>
> Eighteen-year-old Rafielle McGhee testified that she had been a friend of the victim for a number of years and at the time of the shooting was a student at South Side High School. Ms. McGhee said that on the morning of October 27, 2000, the defendant jumped in front of a car and made a gang sign at the boys in the car, who were from another high school. The defendant and the boys in the car began to argue and then throw punches. The defendant did not have a gun during this fight. She said that three or four people were fighting against the defendant and one other person. The victim was not involved in the fight. After the fight was over, the boys in the other car left. The defendant left with Chevis Maxwell in a car driven by Anika Glover. Ms. McGhee eventually left with her aunt. After driving around the block, she spotted the victim and Zain Holst walking down the sidewalk of Lucille Avenue. Neither were armed, and the victim was walking closer to the street. Ms. McGhee saw a white car containing Ms. Maxwell, Ms. Glover, and the defendant

---

[1]At the post-conviction hearing, the Petitioner also alleged that trial counsel was ineffective in that counsel failed to: (1) communicate adequately; (2) adequately investigate the case; (3) adequately address the issue of the Petitioner's tear drop tattoos at trial; and (4) Petitioner's decision not to testify at trial was neither knowing nor voluntary. The trial court found these issues to be without merit, noting that no witnesses or proof, other than the Petitioner's allegations, were presented. The only issue the Defendant raises on appeal pertains to his trial counsel's failure to explore the Petitioner's alleged "diminished capacity."

slow down as it approached the victim. The defendant, who was sitting in the backseat on the driver's side, pointed a gun out of the window and shot the victim. Before the shooting, the defendant did not exchange words or gang signs with the unarmed victim or Mr. Holst.

John Holmes, a project facilitator with the Memphis City Schools, testified that he was at South Side High School on the day of the shooting to attend an 11:30 a.m. meeting with the principal. The fight started about the time he entered the school. He said he saw three or four teenagers jumping on another teenager. He informed security and the principal about the fight, which was stopped after five to seven minutes. His meeting with the principal was postponed, and he left the building a few minutes later. He talked to another worker at the school for five to eight minutes as he left the building. On the way to his car, he heard a loud boom that sounded like a gunshot and saw the victim lying on the ground. He then saw a white car with two girls and a boy driving past him. He said about fifteen to twenty minutes elapsed from the time the fight was stopped to the time of the shooting.

Anika Glover testified that she was a student at South Side High School on October 27, 2000. Her cousin, Chevis Maxwell, was the defendant's girlfriend, and she also knew the defendant from their days together in the band. Ms. Glover said that following the pep rally on the morning of the 27th, she and Ms. Maxwell drove her little sister to their aunt's house in a white Ford Taurus that a cousin had rented. Upon returning to the school to pick up some friends, Ms. Glover thought she saw the defendant standing on a car. She drove over to the defendant, who was not wearing a shirt and had blood on his right leg. She said the defendant had no apparent difficulty walking or talking. The defendant demanded that she drive him to the Philsar, an apartment complex located on a street by that name. She said she initially refused to take him there but eventually gave in to his demand after he screamed at her to take him to the apartments. On the way to the Philsar, he explained his injured condition by saying that some "hooks" or gang members had attacked him.

Ms. Glover testified that on the way to the apartment building, they stopped at a traffic light and that the defendant spoke to some friends in another car, telling them that some hooks had jumped on him. She said that although she did not remember his exact words, the defendant "was asking them I guess to ride with him or, you know, to go back and get revenge with him or whatever." These friends did not respond but drove away in the opposite direction. Upon arriving at the apartments, the defendant instructed her to drive around to the back where he got out of the car. While Ms. Glover was turning the car around, the defendant retrieved a long item wrapped in a piece of cloth from some bushes. She said that she thought that this item was a gun and that the defendant intended to do something bad. Ms. Maxwell had moved to the front passenger seat, and, against Ms. Glover's wishes,

the defendant got into the backseat. He asked her to drive him to Ms. Terry Faulkner's house in the direction of the school, and she complied. As they were returning from the apartments, the defendant met other friends named Rico and Quincy. He told them what happened and asked if they would go with him. They also refused. When they saw the police, the defendant ducked down in the backseat and told her to calm down and to drive slower.

Ms. Glover testified that when they arrived on Lucille Avenue, traffic in front of her forced her to stop the car. She saw Mr. Holst and another boy walking down the sidewalk. She said that when she stopped, she saw the rear driver's side door open and the defendant point the gun out of the car. Then she heard a gunshot. The defendant said nothing before he fired the gun. Before she knew whether anyone had been shot, she drove off with the defendant telling her where to drive. She said the entire trip to and from the Philsar took approximately ten minutes. She said that after the shooting, the defendant seemed angry and upset. She asked the defendant to get out of the car, but he replied that he could not. Minutes later, the defendant got out of the car near South Side High School and ran away from the crime scene, leaving the gun on the backseat. Ms. Glover then pulled into Ms. Faulkner's driveway and told Ms. Maxwell to do something with the gun. Ms. Glover said Ms. Maxwell and Ms. Faulkner's son Chris wrapped the gun in some towels and threw it over the fence behind Ms. Faulkner's house.

Chevis Maxwell testified that on October 27, 2000, she was the defendant's girlfriend and a student at South Side High School. She said that after the pep rally that morning, she went with her cousin, Anika Glover, to cash her paycheck. She said they returned to school twenty to twenty-five minutes later to find the fight over and the defendant's right leg "busted open" and bleeding. She said the defendant, who was a member of the Crips, explained to her that the boys in the car "threw" the Vice Lords' gang sign at him, he responded with his gang sign, and a fight ensued. She said that they stopped at a traffic light and waited there after it turned green while the defendant spoke with Johnny Martin, a fellow member of the Crips. She said that after he retrieved the gun, Ms. Glover told him she did not want to be involved with whatever was going on. Ms. Maxwell said that she tried to talk the defendant into going to the hospital to have his leg treated but that he refused because he was too upset. She said she reminded the defendant that they did not want to get into trouble in a rental car and told him they could get hurt. She said that as they left the apartments, they saw Rico and Quincy. She said that the defendant told them he had been jumped and asked them if they were going to ride with him. Both Rico and Quincy were Crips, but neither responded to the defendant's request. She also said that in disposing of the gun, she wrapped it in the same towel that the defendant had used. On cross-examination, she agreed that the defendant was very upset.

Thirty-year-old Quentin Goodwin testified that on October 27, 2000, he and

Terry Echols ate breakfast with Mr. Goodwin's mother at Lincoln Elementary School. Afterwards, Mr. Goodwin and Mr. Echols began walking to the house of Mr. Echol's grandmother. On the way, the defendant, whom Mr. Goodwin did not know, jumped out of the bushes and asked for their shirts, but they refused his request. The defendant's shirt was covered in blood, and he told them that he had been attacked by some "VLs" and had just shot one. The defendant had cuts on his right shoulder and below his right knee. The defendant got a new shirt from someone in one of the houses down the road. He caught up with Mr. Goodwin and Mr. Echols and proceeded to walk with them. The police arrived and arrested all three of them.

Dr. Teresa Campbell testified as an expert in forensic pathology. She performed an autopsy on the victim. The victim had a 1.7 inch entrance wound in his left eye caused by shotgun pellets and some smaller pellet wounds on his face. For the most part, the pellets struck his face in a mass, but the smaller pellet wounds indicate that they were beginning to spread out as they struck the victim's face. The pellets destroyed the victim's eye, fractured his skull, and entered his brain. The victim died from severe brain lacerations, injuring the part of the brain that controls respiration and heart beat.

Donald Gray, a criminal investigator, testified for the defense that he was able to drive from the high school to the Philsar apartments in one minute, thirty seconds. He was able to drive from the high school to the rear of the Philsar in two minutes, forty-one seconds. His return trip lasted one minute, fifty-five seconds. He drove at the normal rate of speed.

Based upon this testimony, the jury convicted the defendant of first degree, premeditated murder.

State v. Demond Gardner, No. W2002-00607-CCA-R3-CD, 2003 WL 21488004, *1-4 (Tenn. Crim. App., at Jackson, Mar. 4 2003), *perm. app. denied* (Tenn. Jun. 26, 2003).

### B. Post Conviction Hearing

The following evidence was presented at the Petitioner's post conviction hearing. The Petitioner testified that, four months prior to the incident that lead to his conviction for first degree murder, he received a gunshot wound to the head, went to the hospital for treatment, and received medication. Consequently, the Petitioner had head problems and developed a short temper. The Petitioner asserted that he told his trial counsel ("Counsel") about this gunshot wound and informed that he was on anti-seizure medication. He also explained that, due to his previous gunshot injury, he had problems maintaining his temper and suffered from a loss of memory. He told Counsel that a number of witnesses could testify that he received a gunshot wound that affected his personality. He also told Counsel that he took special education classes. Counsel obtained the Petitioner's

medical records that showed that the Petitioner went to the hospital after his gunshot wound. Counsel never described the theory of diminished capacity to the Petitioner, never told the Petitioner that, if the Petitioner testified, he could describe the effects of his prior gunshot wound, and never described the defense that Counsel planned to use at trial.

On cross-examination, the Petitioner alleged that he did not decide to kill anybody but acknowledged that he put a gun to the victim's face and "blew his head off." The Petitioner acknowledged that, despite his gunshot injuries, he could recall how to perform many tasks such as reading, writing, and using the telephone. The Petitioner did not know the name of the medication that he took to treat his gunshot injuries. When asked how his medication affected his mental faculties, the Petitioner responded that he did not understand the question.

Counsel testified that, after being evaluated, the Petitioner was determined to be competent to stand trial. Counsel said that the Petitioner seemed articulate and did not indicate that he had any mental problems. Further, the Petitioner never told Counsel about the Petitioner's memory problems and never discussed the Petitioner's medication. Counsel explained that his theory of defense centered around the argument that the Petitioner did not have sufficient time to calm down after the fight and deliberate a design to commit a killing.

On cross-examination, Counsel testified that he knew about the gunshot wound that the Petitioner received four months prior to the killing that led to the Petitioner's first degree murder conviction. He never discussed the theory of diminished capacity with the Petitioner. Counsel testified that he did not understand how diminished capacity was a viable defense to the Petitioner's first degree murder charge. Counsel acknowledged that he never asked doctors to evaluate the Petitioner regarding the theory of diminished capacity. Counsel said that he was aware of the Petitioner's quick temper but that the Petitioner exhibited a short temper before the Petitioner received his gunshot wound. He denied having any information about lay witnesses that could testify about how the Petitioner changed after receiving the gunshot wound. Counsel then read from reports that an investigator prepared for the Petitioner's case in which lay witnesses stated that the Petitioner had a different personality after the gunshot wound and that he received medication because he had a seizure. Counsel stated that he was unfamiliar with diminished capacity being a legal defense.

On redirect examination, Counsel provided the following explanation regarding his decision to refrain from arguing about the Petitioner's alleged diminished capacity:

Any medical related issues we would submit to a profession and let them make a decision as to whether there's some basis to proceed with that, and we asked for an evaluation and one was done, and so I didn't think there was any basis to proceed under that theory, and I wasn't aware of any basis to proceed.

Counsel explained that he provided information about the Petitioner's previous gunshot wound and special education classes to the mental health experts who examined the Petitioner. He testified that the mental health experts use all of the information regarding a defendant to determine if he or she

is competent. Counsel further explained that the mental health experts determined that the Petitioner was competent to proceed with the disposition of the case and that he was competent at the time of the offense. He also testified that the mental health experts determined that the Petitioner was able to understand right from wrong and did not reach any conclusions supporting the defense of insanity.

## II. Analysis

The Petitioner argues that he should receive post-conviction relief because he received ineffective assistance of counsel at trial because his trial counsel failed to have mental health experts ascertain the viability of a diminished capacity argument. The State contends that the Petitioner did not receive ineffective assistance of counsel and is not entitled to relief on this issue.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001) (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). A post-conviction court's conclusions of law, such as whether counsel's performance was deficient or whether that deficiency was prejudicial, are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge

the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

In its written order denying post-conviction relief, the post-conviction court made the following findings:

> At the evidentiary hearing, Petitioner testified that he had informed his defense attorney that four months prior to the killing he had been shot in the head and had been hospitalized. For some period of time Petitioner was taking anti-seizure medication, had memory problems and had a short temper and a change of personality. Despite this information, his attorney never discussed with him the possibility of raising diminished capacity. [Counsel] testified that he had the defendant forensically examined. Petitioner was found competent to stand trial and an insanity defense could not be supported. Defense counsel was aware that the defendant had been shot in the head and had a learning disability, but denied having been informed by the defendant of any memory problems or of any medications. With regard to the defendant's quick temper, [Counsel] recalled the witnesses indicating this to be a problem for the defendant which pre-dated the wound to his head. Defense counsel did acknowledge that his investigation revealed two witnesses who could have testified that after the gunshot wound to the head, Petitioner had a change in personality, was short-tempered, and quick to snap. [Counsel] further testified that he was not familiar with the legal concept of diminished capacity.

> The court is concerned that defense counsel was not aware of the rule of evidence known as "diminished capacity." See [sic] W. Mark Ward, TENNESSEE CRIMINAL TRIAL PRACTICE, § 23:11 (Thomson-West 2006). Although failure to investigate or consider the same could arguably be considered deficient performance, the fact remains that the Petitioner has offered no witnesses, expert or otherwise, that would support diminished capacity. The rule of diminished capacity authorizes the defendant's presentation of expert, psychiatric evidence. As such, the Petitioner has failed to demonstrate prejudice in this regard.

In the case under submission, the evidence does not preponderate against the findings of the post-conviction court. The Tennessee Supreme Court has stated that "[i]n modern application, diminished capacity is not considered a justification for a crime, but rather an attempt to prove the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime . . . ." See

-8-

State v. Hall, 958 S.W.2d 679, 688 (Tenn. 1997). The Hall Court further explained: "In other words, 'diminished capacity' is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state. 'Properly understood, it is . . . not a defense at all but merely a rule of evidence.'" Id. at 688-89 (citations omitted). Therefore, unlike self-defense, diminished capacity is not a defense to a crime.

In this case, the Petitioner has failed to establish prejudice. As part of his appeal, the Petitioner alleges that, pursuant to Tennessee Supreme Court Rule 13, he had no funds to obtain expert witnesses or to hire an investigator to track down lay witnesses who could provide testimony regarding the Petitioner's diminished capacity to present to the post-conviction court. The Petitioner is correct that the Supreme Court disallows the payment by the State of investigators and expert witnesses in non-capital cases to help establish the prejudice prong. That alone, however, does not allow us to disregard the well-established legal principle that the trial court in a post-conviction hearing may not speculate about what the evidence from those witnesses would have been. See Black v. State, 749 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding, "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a witness or what that witness' testimony might have been if introduced by defense counsel."). The Petitioner did not present one of the witnesses who could testify about his diminished capacity mentioned in the investigative report at his post-conviction hearing. As such this Court must dismiss the Petitioner's contention without further consideration pursuant to Black. Id. at 757.

Furthermore, the record indicates that Counsel's failure to call an expert witness regarding the Petitioner's alleged diminished capacity did not prejudice the Petitioner. Mental health experts evaluated the Petitioner and concluded that he was competent to stand trial. There is nothing in the record to indicate that these experts would have testified about the Petitioner's alleged diminished capacity had Counsel requested them to do so. Counsel testified that the mental health experts determined that the Petitioner was competent to proceed with the disposition of the case and that he was competent at the time of the offense. The evidence presented at the Petitioner's trial established that the Petitioner was beaten, left the area, obtained a shotgun, returned several minutes later, and shot the victim in the face. Therefore, the Petitioner has failed to demonstrate that, in light of the strong evidence presented against him at trial, a reasonable probability exists that, had the jury been presented with evidence of the gunshot wound to the Petitioner's head and his resulting mental difficulties, he would not have been convicted of first degree murder. The Petitioner has failed to satisfy the prejudice prong of the Strickland test, and he is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE